In Re Abintestato de Don Hiram Gómez Cintrón, Elisa Fedora Gómez Doittau, peticionaria, Ex Parte. General Accident Fire & Life Assurance Corporation, Etc., peticionarias y apeladas; Alonso Aguilar, et als., acreedores, opositores y apelantes.

Núm. 7571.—*Sometido:* Noviembre 14, 1939.—*Resuelto:* Marzo 8, 1940.

*J. Alemañy Sosa,* abogado de los opositores apelantes; *Brown, González & Newsom* y *Wilson P. Colberg,* abogados de las peticionarias apeladas; *Oscar Souffront,* abogado del Administrador Judicial.

EL JUEZ ASOCIADO SEÑOR WOLF emitió la opinión del tribunal.

Es ésta una apelación de un incidente que surgió dentro de la administración judicial del caudal relicto a la muerte de Hiram Gómez. El finado había sido un prominente agente de seguros en la isla y como tal había representado a varias compañías inglesas y americanas. El 16 de marzo de 1935 el Lic. Henri Brown, como abogado de las compañías Western Assurance Company of Canada, United States Guaranty Co., de Nueva York, Federal Insurance Company, de Nueva Jersey, Hartford Fire Insurance Company, de Connecticut, y la General Accident, Fire and Life Assurance Company, de Perth, Escocia, que en lo sucesivo serán descritas como "las compañías", para todas las cuales el Sr. Gómez había actuado como agente general, dirigió una carta al administrador judicial interino de sus bienes solicitando que separara y depositara en una cuenta especial todas aquellas primas cobradas o pendientes de cobro sobre pólizas expedidas por dichas compañías en vida del finado y por mediación de su agencia. De acuerdo con una orden de la corte de distrito correspondiente, el administrador judicial interino, y posteriormente el administrador en propiedad, depositaron estos cobros específicos en una cuenta especial.

En marzo de 1936 las compañías radicaron una petición en la que solicitaban la entrega a su abogado de las primas

cobradas y depositadas en la cuenta especial supra, así como también la cesión y traspaso a dicho abogado de todas las cuentas pendientes de cobro por concepto de primas. Uno de los acreedores generales del finado, Alonso Aguilar, (a quien se unieron otros posteriormente) se opuso a la petición de las compañías, basado en que la relación entre Hiram Gómez y éstas en cuanto a la primas era la de acreedor y deudor y que por lo tanto las compañías debían considerarse como acreedores comunes. Las compañías, por el contrario, sostuvieron que las primas les pertenecían exclusivamente a ellas y que en su consecuencia no formaban parte de los fondos de la herencia misma. Ésta es la única controversia fundamental en este caso. El administrador judicial radicó un escrito en que solicitaba que antes de que la corte ordenase la disposición del fondo en controversia, las comisiones del finado debían ser deducidas del mismo y transferidas a los fondos generales de la herencia, al igual que ciertas cantidades en pago parcial de los honorarios de dicho administrador y de su abogado. La corte declaró con lugar la petición de las compañías, dictando a la vez ciertos pronunciamientos en relación con los honorarios mencionados. No se hace referencia en la opinión a la deducción de las comisiones, pero presumiremos que, sea cual fuere nuestra conclusión final, su importe será debidamente acreditado a la sucesión de Hiram Gómez.

Siete son los errores señalados por los apelantes. Se oponen principalmente a la conclusión a que llegó la corte con respecto a la relación fiduciaria existente entre el finado y las compañías. La corte de distrito resolvió que dicha relación era la de principal y agente y que las compañías nunca se desprendieron de su derecho a las primas en este caso.

El primer señalamiento de error se refiere a la admisión en evidencia de varios contratos de agencia presentados por las compañías para probar los términos bajo los cuales

ellas hacían negocios con el Sr. Gómez. Los apelantes sostienen que dichos contratos no fueron suficientemente identificados. En vista de la estipulación posteriormente radicada por las partes este error pierde su importancia, por cuanto en dicha estipulación se conviene en que Hiram Gómez expedía pólizas de seguro como representante o agente de las compañías. Aparece además en varias otras formas que Gómez era agente general de las compañías.

■■ La verdadera contienda en apelación es si las cantidades cobradas por el administrador judicial en concepto de primas pagadas después de la muerte de Gómez pertenecen a las compañías o a los fondos generales de la herencia. En su consecuencia, expondremos la parte principal de la estipulación radicada por las partes para obviar la necesidad de presentar evidencia por parte de los acreedores opositores:

"6. Que a fin de evitar là celebración de una nueva vista y la demora de la resolución en este caso, las partes comparecientes por la presente acuerdan y estipulan que de acuerdo con los libros de contabilidad del finado Hiram Gómez, las copias de los informes mensuales de las remesas hechas por el finado Hiram Gómez, a las compañías peticionarias, y copia de los informes mensuales de los cobros efectuados por el Administrador Judicial durante el tiempo de su administración, resulta el siguiente estado de hechos:

"A.—Que el Sr. Hiram Gómez expedía pólizas de seguro como agente o representante de dichas Compañías a los asegurados por el riesgo que las mismas cubrieran.

"B.—El importe de dichas primas, cuando no se pagaba de contado, era cargado en cuenta corriente, abonándole los pagos hechos por el asegurado, muchas veces en sumas parciales, por el Sr. Hiram Gómez.

"C.—El importe de dichas primas el Sr. Hiram Gómez lo abonaba en los libros de él a las compañías aseguradoras, descontando el 25 por ciento que le correspondía por comisión, también en cuenta corriente.

"D.—Después del día último de cada mes el señor Hiram Gómez enviaba a las compañías una lista de las pólizas expedidas durante el mes anterior y las primas que devengaba cada una de ellas, y

debía remesar el total de dichas primas, después de descontada su comisión, y las primas por pólizas canceladas, a la General y a la Hartford, a los sesenta días y a la Western, United States y Federal, a los 45 días.

"Después del día último de cada mes el Sr. Hiram Gómez remesaba a las compañías cantidades de dinero para abonar a los saldos que a favor de las compañías por primas vencidas arrojaban las cuentas corrientes con dichas compañías de seguro que él llevaba en sus libros y para hacer dichas remesas el Sr. Gómez giraba contra sus cuentas en los bancos de Puerto Rico.

"El Sr. Gómez depositaba dichas cuentas en los bancos de Puerto Rico, que eran cuentas corrientes a nombre de él solamente, los ingresos provenientes de sus negocios, incluyendo las primas de seguro que cobraba sobre las pólizas expedidas a nombre de las compañías.

"E.—En caso de que cualquier asegurado dejase de pagar el importe de la prima de su póliza, o parte alguna de dicha prima, dentro de los períodos de 60 días o 45 días que tenía el Sr. Hiram Gómez para remesar a las compañías y dicha póliza no hubiese sido cancelada dentro de dichos períodos de tiempo, las compañías no tenían nada que ver con dicha pérdida, sino que con la misma cargaba íntegramente el señor Gómez.

"Dentro de dichos períodos de 60 días o de 45 días el Sr. Gómez podía cancelar 'flat' cualquier póliza expedida dentro del mes inmediatamente precedente de dicho período de tiempo que hubiese sido ya informado o reportado a las compañías, o sea sin responsabilidad alguna por parte del asegurado o el señor Gómez, por el período de tiempo que dicha póliza hubiere estado en vigor antes de su cancelación.

"7.—Que se acompaña a la presente estipulación copia de los informes mensuales de las remesas hechas por el Sr. Hiram Gómez a dichas compañías de seguro por el último año con anterioridad a la fecha de su muerte, copia de los informes mensuales de los cobros efectuados por el Administrador Judicial durante el término de su administración y el libro donde constan las cuentas corrientes llevadas por el finado Hiram Gómez con los asegurados y las cuentas corrientes llevadas por el Sr. Hiram Gómez con las compañías peticionarias y las reclamaciones de dichas compañías peticionarias al Administrador Judicial por el importe de sus créditos."

Hemos leído los distintos documentos, cartas, certificados de autoridad, etc., ofrecidos en evidencia por las compañías

·y encontramos que son sustancialmente similares en cuanto se refieren a su poder para cobrar las primas. Tanto de estos convenios como de la estipulación sobre las relaciones existentes entre Gómez y las compañías, aparece que sus poderes eran amplísimos. La autoridad escrita fué indudablemente ampliada por los actos abiertamente realizados por el agente en sus negocios. No tenemos duda de que la conducta seguida en los negocios entre las partes es pertinente e importante para la solución de la cuestión principal en este caso. Tenemos que considerar todo hecho admitido para decidir si las compañías, por lo menos después de expirado el término de 45 ó 60 días, descansaban exclusivamente en el Sr. Gómez para el pago de sus primas o si meramente lo consideraban como garantizador de dicho pago. En el primer caso la relación entre el asegurado y la aseguradora podría considerarse sustituída por una de deudor y acreedor entre el agente y la aseguradora, o como el pago de la prima al aceptar el crédito o responsabilidad personal de dicho agente.

En el segundo caso la responsabilidad del agente constituiría una garantía adicional para la principal y no privaría a las aseguradoras de su derecho preferente a cobrar las primas.

Aunque la jurisprudencia no es abundante, una investigación independiente hecha por nosotros ha descubierto algunas autoridades que no fueron citadas por ninguna de las partes. Serán discutidas en lugar oportuno de esta opinión.

Los casos parecen caer en dos clases generales. Hay aquéllos que consideran la cuestión del pago de la prima desde el punto de vista de si la compañía es responsable bajo la póliza aun en aquellos casos en que el asegurado no ha pagado la prima ni al agente ni a la aseguradora. Hay también aquellos otros casos que consideran el efecto que tiene el cargarle las primas al agente haya o no él recibido su importe.

· La costumbre ordinaria seguida en los negocios desempeña un papel importante en todos los casos de esta índole.

En 2 A. L. R. 1664 *et seq.* encontramos la siguiente discusión de autoridades:

"Así pues, en *Train* v. *Holland Purchase Ins. Co.* (1875) 62 N. Y. 598, se resolvió que era inmaterial el hecho de que la prima no hubiese sido pagada por el asegurado cuando aparecía que existía una costumbre entre el asegurador y el agente a virtud de la cual el primero le cargaba al último las primas correspondientes a todas las pólizas que se expidiesen y que periódicamente se saldaba la cuenta, y de acuerdo con este arreglo el agente solicitó la expedición de una póliza bajo un acuerdo con el asegurado de que el asegurador le cargaría la prima al agente y que este último le daría crédito a dicho asegurado por el importe de la prima.

"

"Y en *Wytheville Ins. & Bkg. Co.* v. *Teiger* (Va.) supra (90 Va. 277, 18 S. E. 195), donde no existía evidencia directa al efecto de que era la práctica del asegurador cargarle al agente personalmente el importe de las primas correspondientes a pólizas enviádasle, *pero donde sí hubo declaraciones que levantaron una inferencia de que esto se hacía, la corte declaró que si las primas eran en realidad así cargadas,* entonces entre el asegurado y la compañía la prima había sido pagada cuando la póliza fué entregada, *y apuntó que estaba bien establecida la regla de que cuando el agente extiende crédito y su importe le es cargado a él por el asegurador, la transacción equivale a un pago.*

"Y en *Fidelity & C. Co.* v. *Willey* (Fed.), supra (80 F. 497), donde de acuerdo con una costumbre entre el asegurador y su agente general la compañía le cargó a este último el importe de las primas sobre la renovación de una póliza enviádale para su entrega, y el agente entregó dicha póliza al asegurado sin exigirle el pago de la prima, *se resolvió que la deuda del asegurado había quedado transferida al agente* y que entre el asegurador y el asegurado había mediado un pago, y que una cláusula de la póliza requiriendo el pago previo de la prima no podría utilizarse como defensa para evadir responsabilidad bajo la póliza.

"Y en *Buckley* v. *Citizens' Ins. Co.* (1907) 188 N. Y. 399, 13 L. R. A. (N. S.) 889, 81 N. E. 165, se resolvió que la primera prima sobre una póliza debe ser considerada, entre el asegurador y el asegurado, como pagada al tiempo que el agente general de dicho

asegurador extendió crédito al asegurado, cuando la prima fué cargada al agente en su cuenta con el asegurador, de acuerdo con la costumbre general entre ellos que descartaba cualquier arreglo que los agentes pudieran hacer con el asegurado en cuanto a crédito, a pesar de que un pagaré en pago de la prima entregado al agente por el asegurado no venció hasta después de una tentativa para cancelar dicha póliza y después también de la destrucción de la propiedad, y que al vencerse fué pagado por el agente quien lo había descontado, y todavía estaba en su poder al tiempo de entablarse la acción sobre la póliza, habiéndole sido en el ínterin acreditado a dicho agente en su cuenta con la compañía el importe de la prima no devengada al tiempo de intentarse la cancelación.

"Y en *Bang* v. *Farmville Ins. & Bkg. Co.* (1876) 1 Hughes, 290 Fed. Cas. No. 838, donde de acuerdo con la costumbre, un agente de seguros entregó una póliza a un corredor (*broker*) y con su conocimiento le cargó el importe de la prima en los libros de dicho agente, y le acreditó dicho importe al asegurador y apareció que era la costumbre del asegurador cargarle las primas a sus agentes, se resolvió que el asegurador no podía evadir su responsabilidad bajo la póliza por el no pago de las primas, aunque en dicha póliza se hubiera estipulado que el asegurador no sería responsable hasta que la prima fuese realmente pagada, y que cualquier convenio que no fuese un convenio específico, claramente expresado en la póliza, no podría ser considerado como una renuncia de cualesquiera de las condiciones impresas.

"Y en *White* v. *Connecticut F. Ins. Co.* (1876) 120 Mass. 330, se sostuvo que la evidencia era suficiente para justificar un pronunciamiento al efecto de que el asegurador aceptó el crédito concedido por su agente general a un corredor (*broker*) como pago de la prima, dentro de una disposición de la póliza que decía que la compañía no sería responsable bajo la misma hasta que la prima fuese verdaderamente pagada, donde hubo evidencia de que era costumbre del agente general dentro del curso normal de sus relaciones entregar pólizas a los corredores (*brokers*) sin exigir el pago en efectivo del importe de las primas, que se las cargaba individualmente a cada corredor y rendían un estado de cuenta mensual, y además de que un gran número de las pólizas de la compañía con el conocimiento de ella habían sido expedidas a corredores en esta misma forma, incluyendo la póliza en controversia."

Del caso de *Horton* v. *Eagle Indemnity Ins. Co. et al.*, 171 Atl., 322, tomamos los siguientes párrafos:

"El derecho de un asegurador a cobrar de los asegurados las primas adeudadas y cargadas en cuenta a un agente depende de las relaciones existentes entre el asegurador y su agente. Por los contratos el agente estaba obligado a pagar todas las primas. En tanto en cuanto las pagó, él solamente tenía derecho a cobrárselas a los asegurados. Habiéndolas pagado, podía proceder contra los asegurados, bien fuese bajo la teoría de subrogación, o basándose en una responsabilidad directa por el dinero pagado a cuenta de ellos. El pago le daba derecho al agente a ser considerado como un cesionario de los derechos del asegurador a través de una subrogación y al mismo tiempo equivalía a un préstamo a los asegurados. La agencia en este respecto representaba propiamente tanto al asegurado como al asegurador. Una responsabilidad a base de la promesa al asegurado de obtener y mantener en vigor un seguro es consistente con sus obligaciones hacia el asegurador.

"*En cuanto a las primas no pagadas ni por el asegurado a la agencia ni por la agencia por cuenta del asegurado al asegurador el derecho a cobrarlas después de la terminación de la agencia no está definitivamente convenido por los términos expresos de los contratos. Sus términos implícitos, tal como fueron contemplados por las partes y como surgen de los términos expresos y del curso de los negocios entre las partes, deben por lo tanto ser determinados.* El curso de los negocios es de ayuda en la interpretación práctica necesaria para descubrir el entendimiento común que las partes tuvieron del significado de los contratos y de los resultados que por ellos se esperaba obtener. Los incidentes legales que surgen de dicha relación, tanto de su cumplimiento como de la violación de los contratos, están dentro de la contemplación de las partes y deben considerarse como términos implícitos.

"La prima en sí es una deuda solamente pagadera al asegurador y hasta que el asegurador ha dispuesto de sus derechos en la misma tiene título absoluto legal y en equidad a ella. Pero la disposición de sus derechos puede ser efectuada poniendo en juego las reglas de derecho aplicables a los contratos y a la conducta seguida como consecuencia de éstos, así como también por sus términos expresos. *Si los contratos demuestran que la agencia compró el derecho del asegurador a cobrar las primas sobre las pólizas expedidas por éste, ellas quedaban de la propiedad de la agencia después de su terminación.*

"La cesión de una prima por un asegurador puede ser condicional o absoluta. La entrada en sus libros de un cargo de dicha prima al agente, aunque hecha con el consentimiento de éste, no es suficiente para demostrar una cesión absoluta. No es un reconocimiento por el asegurador de que la prima ha sido pagada. *Brown v. Insurance Co.*, 59 N. H. 298, 309, 47 Am. Rep. 205. *Pero la aceptación por parte del asegurador del crédito individual de su agente como pago de la prima es equivalente a su pago verdadero en cuanto al asegurador y asegurado se refiere. Gaysville Mfg. Co.* v. *Insurance Co.*, 67 N. H. 457, 458, 36 A. 367. Este punto de vista está sostenido por otras autoridades. (Citas.) La deducción lógica es que toda vez que el asegurador no puede alegar el no pago de la prima, la misma pertenece al agente. De otro modo el asegurado se escaparía.

"La deducción está de acuerdo con la intención de las partes tal como se evidencia en los contratos de agencia en la interpretación de los cuales las relaciones de negocios bajo los mismos son explicativas. *El convenio de parte del agente a que se le cargase el importe de las primas debía ser interpretado como representativo de su compra, a menos que fuese uno de fianza (suretyship) para los asegurados. Si no compró las primas y meramente garantizó su pago, los asegurados siguieron siendo deudores del asegurador. Hasta que el fiador paga el asegurador no se desprende de ninguno de sus derechos. El convenio del fiador es una garantía para la deuda principal de los asegurados hacia el asegurador.* Pero si el asegurador acepta el convenio del agente en sustitución de la responsabilidad de los asegurados, el convenio no es uno de fianza sino que el derecho a cobrar las primas se transfiere por el mismo al agente.

"*En cuanto a si fué una compra o una fianza, puede decirse que en ningún momento se solicitó el pago de prima alguna por el asegurador mientras duró la agencia de otra persona que no fuera la agencia. Siempre descansó exclusivamente en dicha agencia para el pago.* Llevó una cuenta con la agencia compuesta de cargos y créditos y el contrato requería que la cuenta se saldara periódicamente. *El pago de la cuenta se hacía mediante cheque librado contra la única cuenta bancaria que tenía el agente a su propio nombre.* No existían depósitos especiales segregando las primas en fideicomiso. La agencia actuaba como un deudor corriente y no como un fiduciario.

"*La agencia tenía derecho a extender crédito por el importe de las primas. Así pues, podía tratar personalmente con los asegurados. Podía llevar una cuenta corriente con cada uno de ellos cargando en*

ella las primas sobre las pólizas de todas las compañías en que dicho cliente estaba asegurado, así como partidas de cualquier otra índole. El asegurado, al saldar su cuenta, tenía derecho a considerar la agencia como su acreedor sin responsabilidad alguna hacia el asegurador.

"*Esta costumbre era conocida por el asegurador y mantenida con su consentimiento.* Resulta por lo tanto que la aceptación del crédito personal de la agencia por el importe de las primas debía considerarse como una sustitución absoluta de las mismas. La retención por el asegurador del derecho a cobrar las primas sobre pólizas expedidas por la agencia durante la existencia de ésta sería inconsistente con la práctica permitida a la agencia bajo la vigencia del contrato de agencia. El asegurador, descansando exclusivamente en el agente para el pago de las primas, cedió todo su interés en ellas. Los hechos manifiestan esta venta. Ni la omisión de parte de la agencia de solventar su deuda con el asegurador por el crédito concedídole ni la terminación de dicha agencia le devolvió derecho alguno al asegurador a cobrar las primas adeudadas por el asegurado. El derecho fué incondicional y absolutamente transferido a la agencia.

"Habiendo por lo tanto comprado todas las primas sobre todas las pólizas que la agencia pudiese expedir, la misma no estaba bajo ninguna obligación fiduciaria de dar cuenta de ellas. Le pertenecían para hacer con ellas lo que mejor le conviniese. *La cláusula en algunos de los contratos de que las primas menos la comisión debían ser remitidas al asegurador al ser pagadas a la agencia no altera la situación.* La cláusula es meramente una disposición para fijar una fecha especial para el pago de la deuda de la agencia al asegurador en cuanto a las primas pagadas a la agencia. Ni tampoco hace diferencia alguna la cláusula en uno de dichos contratos al efecto de que hasta que se remitiera la cuantía adeudada sobre las primas cobradas por la agencia esta suma se consideraría como de la propiedad del asegurador y 'como un depósito fiduciario.' El curso de los negocios entre las partes demuestra una renuncia o cancelación de dicha condición. *El contrato estuvo en vigor por más de tres años, y la manera de efectuar los pagos y los métodos comerciales de la agencia durante este período de tiempo estuvieron bajo el conocimiento del asegurador.* El acuerdo e intención de ambas partes de que dicha cláusula debía ser ignorada está por lo tanto definitivamente demostrado. Las prácticas empleadas por la agencia y aceptadas por el asegurador equivalían a una modificación oral o cancelación de esta condición del contrato y dicha alteración es válida. *Warren* v. *Dodge,* 83 N. H. 47, 48, 138 A. 297, y casos citados.''

Por otra parte, el caso de *Alliance Insurance Co.* v. *City Realty Co.*, 52 F. (2d) 271, trata una cuestión similar de la manera siguiente:

"Al transcurrir el período de 60 días contado a partir del mes en que se expidieron las pólizas, el agente venía obligado a remitir a cada compañía de seguros el 'saldo' que apareciera en el informe mensual para el mes correspondiente a aquél para el cual se otorgaban las pólizas, ora el agente hubiera cobrado las primas o no. En otras palabras, si el agente, luego de librar la póliza, no la cancelaba dentro del tiempo concedido para la cancelación 'de plano' y no cobraba la prima, sino que extendía nuevo crédito al asegurado, entonces el agente, independientemente de si jamás cobraba o no la prima, era responsable a la compañía de seguro del 80 por ciento de la prima, 80 por ciento que se había incluído en el 'saldo' informado a fines del mes en qué se otorgaba la póliza.

"Las compañías de seguro no se entienden directamente con los tenedores de póliza a no ser por mediación de sus agentes, y nada tenían que ver con el sistema empleado por el agente al llevar sus libros de contabilidad, cobrar las primas o depositar en los bancos el dinero recaudado. Simplemente exigían a los agentes que remitieran los 'saldos' indepedientemente de los cobros por ellos efectuados.

"  .        .        .        .        .        .        .        .

"Una póliza de seguro es un contrato entre la compañía y el asegurado, en el cual el asegurado conviene en pagar la prima al asegurador. La obligación puede ser cumplida pagando la prima al agente, pero la obligación existe en favor de la compañía. El agente conviene en cobrar la prima y en remitir el producto, menos su comisión, al expirar el período de 60 días contados desde aquél en que termina el mes en que se expidió la póliza. La compañía a su propio riesgo concede al agente 15 días contados a partir del mes en que se otorgue la póliza, para cobrar la prima y entonces le autoriza, si no logra cobrar dentro de dicho período, a cancelar la póliza 'de plano' sin responsabilidad alguna de parte suya. Si el agente no cobra ni cancela dentro del tiempo concedido para la cancelación de plano y por el contrario opta extender un nuevo período de crédito al asegurado, la compañía le permite hacerlo así, pero sólo a condición de que él personalmente se haga responsable de la parte de la prima correspondiente a la compañía. Su responsabilidad no es la de un garantizador, sino la de un obligado prin-

cipal. *La compañía, como cuestión de táctica mercantil que se considera beneficiosa tanto para sí como para el agente, está dispuesta a correr el riesgo desde la fecha en que se otorga la póliza hasta el 15 del mes siguiente, mas no está dispuesta a correr el riesgo más allá de dicho período.* La compañía no cree que le resulta beneficioso continuar siendo responsable bajo la póliza con la mera promesa del asegurado de que pagará la prima. La concesión de un nuevo período de tiempo podría beneficiar a la compañía, mas no está dispuesta a correr tal riesgo. El prorrogar el período de tiempo incondicionalmente daría al agente la oportunidad de cobrar la prima y en su consecuencia recibir su comisión, pero si no tenía éxito en el cobro no perdería nada mientras que la compañía hubiera asumido el riesgo sin recibir compensación alguna. El prorrogar incondicionalmente el crédito resultaría en su consecuencia beneficioso al agente y contrario a los intereses de la compañía. Por consiguiente, el agente no puede ampliar el riesgo de la compañía sin autoridad de ésta, y, en consideración a tal autoridad, el agente conviene, en beneficio propio, en hacerse responsable a la compañía con su parte de la prima, sea ésta cobrada o no. *La responsabilidad es la existente entre un deudor y un acreedor, mas es una responsabilidad adicional a la del asegurado, que surge de una garantía separada y original por parte del agente, basada en una causa (consideration) y no tiene efecto sobre el contrato existente entre la compañía y el asegurado a no ser para impedir la caducidad del mismo. Al conceder un nuevo período de gracia el agente actúa a nombre de la compañía y con la autoridad de ella.* Prolonga la vida del contrato y la responsabilidad de la compañía en favor del asegurado por virtud de la póliza continúa y continúa también la responsabilidad del asegurado para con la compañía por el pago de la prima. Es el crédito de la compañía y el riesgo de la compañía lo que se prorroga, y luego de tal prórroga la compañía recibe la promesa del asegurado de que pagará la prima, así como la promesa del agente de que pagará la prima después de deducir su comisión. *La compañía entonces depende del agente como tal para el cobro del dinero del asegurado y para la remisión del 'saldo' dentro del período de 60 días o, si deja de cobrarlo como tal agente, entonces como un obligado independiente para remitir el 'saldo' en cumplimiento de su obligación separada e independiente.*

*"Si el agente, actuando como agente y como obligado independiente, deja de remitir y se pone fin a su agencia, la compañía tiene una reclamación válida tanto contra el asegurado como contra el*

*obligado independiente.* La compañía puede proceder contra uno u otro o contra ambos, hasta que su reclamación sea satisfecha: Si ella no puede obtener el 'saldo' del obligado independiente, puede hacerse cargo de la cuenta, cobrarla, o la parte de ella que sea cobrable y acreditar el 'saldo' con el producto. La cuestión relativa al cobro de la deficiencia de un obligado independiente no tiene importancia alguna en este caso, toda vez que el informe del árbitro (*master*) recomienda que no se dicte sentencia por la deficiencia debido a que el valor de las cuentas y el 'vencimiento' de éstas no puede determinarse con precisión y por la razón ulterior de que la parte demandada es insolvente.

"Si el agente paga el 'saldo' en su calidad de obligado, entonces puede más tarde cobrar la prima y reembolsarse del producto obtenido.

"En este caso, al celebrarse el contrato en 24 de mayo de 1929, se desprendía que todos los saldos de las pólizas libradas con anterioridad al 1ro. de diciembre de 1928 se habían ya remitido. Si esos saldos hubieran sido pagados por el demandado como obligado independiente de su propio dinero, entonces él hubiera tenido derecho a cobrar las cuentas que vencían con anterioridad al 1ro. de diciembre de 1928, y a retener el producto a fin de reembolsarse. Mas esos saldos, ascendentes en total a $4,898.79 fueron pagados de los cobros efectuados sobre pólizas otorgadas con posterioridad al 1ro. de diciembre del año ya mencionado; es decir, con dinero de las compañías de seguro y no del propio peculio del demandado. Por tanto, jamás existió por parte del demandado el derecho a cobrar esas cuentas y a retener su producto.

"El dominio de cuentas por las compañías de seguro es cuestión que se discute en casos ya decididos. *Véase U. S. F. & G. Co.* v. *Sexton,* 134 Ga. 56, 67 S. E. 649; etc.... Tal dominio fué en efecto reconocido por las partes que intervinieron en este caso en el contrato por ellas celebrado el 24 de mayo de 1929.

"Además, el árbitro (*master*) halló que al terminarse una agencia y al estar el agente atrasado en el pago de los saldos, existe la costumbre universal o un sistema reconocido de arreglar estos asuntos, bajo los cuales la compañía tiene derecho a tomar las cuentas, cobrarlas, y aplicar el producto de las mismas a los saldos no remitidos. *La prueba fué contradictoria respecto a la costumbre, pero varios testigos declararon sobre su existencia y efecto.* La conclusión está ampliamente sostenida por la prueba y, siguiendo los principios bien reconocidos de procedimiento, la misma no debe ser alterada por este tribunal."

Las apeladas también citan los casos de *Central National Bank* v. *Connecticut Mutual Life Ins. Co.*, 104 (XIV Otto) U. S. 54 e *In re Mason Co.*, 254 F. 164, pero ninguno de ellos presenta la posición de las apeladas más vigorosamente que la cita anterior.

Hemos creído conveniente copiar la jurisprudencia que antecede sobre la materia. En algunos de los casos, especialmente en los más antiguos, las cortes hicieron deducciones de los hábitos y costumbres que habían surgido entre las tres partes, o sea entre las compañías, los agentes y los asegurados. En el presente caso los contratos existentes entre las partes y la estipulación que puede hallarse en los autos y que ha sido copiada en esta opinión tienden todos a una conclusión, a saber, que Gómez no era un mero garantizador de los asegurados, sino que su relación con respecto a los fondos que vencían era la de principal y que entre él y las compañías surgió la relación de deudor y acreedor.

*Debe revocarse la resolución apelada y devolverse el caso para ulteriores procedimientos no inconsistentes con esta opinión.*

El Juez Asociado Sr. Hutchison disintió.*